MARSHALL v. STATE.

4241                                            159 S. W. 2d 749

Opinion delivered March 16, 1942.

GRIFFIN SMITH, C. J. The jury found that appellant received mercury (popularly referred to as quicksilver) knowing it had been stolen. He sold more than two hundred pounds to a merchant at Murfreesboro.

Motion for a new trial questions sufficiency of the evidence.

Without objection a written statement made by appellant in July was admitted in evidence. Appellant lives near Kirby, in Pike county. He had known George Herron six or eight months.

About July 15 Herron and a Negro came to appellant's home, remaining twenty minutes. They transferred from the car driven by Herron to appellant's car a number of bottles and fruit jars filled with mercury. The glass containers were in buckets and half-bushel tubs.

Appellant's son, Floyd, joined the trio after the mercury had been reassigned, and the four started to Murfreesboro, a distance of more than fifteen miles. When within three or four miles of town, Herron and the Negro got out of the car and remained at the roadside until appellant and his son returned. The latter drove into town, stopping at Watson's store. Appellant had previously asked Watson whether he purchased mercury, and received an affirmative answer.[1]

Appellant says he did not tell Watson where the mercury was to come from: only asked him if he were buying it, and the reply was "yes." The offer was $2.10 per pound, and 203 pounds were marketed. Regarding a conversation that took place before the metal was delivered, appellant says he told Watson he intended to buy mercury, and "thought he would be able to supply him." Nothing was said about the quantity. Appellant insists he did not know what the market price was, but told Watson the basis should be more than $2.10.

When delivery was made Watson took the bottles and jars into his store. About thirty minutes later the amount due was communicated to appellant, and payment was made. On the return trip, appellant and Floyd rejoined Herron and the Negro. After appellant and his associates reached appellant's home, Herron was paid $200. The Negro was momentarily absent when the money changed hands. He was identified as Leon Cooper, of New London, Texas.

Cooper testified that he had known Herron two months or more. The mercury had been stolen from gas meters in the oil fields. Herron showed witness how to extract the mercury, and witness robbed the meters, as directed, collecting approximately one gallon. It was concealed for several days.

In explaining the transaction, Cooper said: "I gave it to him when he came back after it." The witness then testified that, with Herron, the mercury was brought into Arkansas in Herron's car. It was taken "out to the home

---

[1] The statement was in the form of questions asked by the prosecuting attorney, and answers made by appellant. A stenographer took down the conversation, transcribed her notes, read the typed pages to appellant, and he signed them.

of a fellow named Marshall,'' about seventeen or eighteen miles east of Murfreesboro.

Appellant was identified as the ''Marshall'' referred to by Cooper, and Cooper in substance reviewed the transactions admitted by appellant in his signed statement. He explained that he and Herron got out of appellant's car at appellant's request before Murfreesboro was reached, and that appellant and his son were gone about two hours. Cooper did not know what amount of money appellant delivered to Herron, but Herron paid witness $35 for his ''services,'' and for stealing the mercury.

Herron and Cooper returned to Texas. Cooper got out of Herron's car at Mount Pleasant, and was later arrested.

When appellant was arrested, he denied knowing Herron or Cooper. As a witness in his own behalf, appellant admitted having made two trips to Texas. His son, Preston Marshall, had been convicted there for dealing in ''hot'' mercury. In February appellant was questioned in connection with a transaction similar to that resulting in his son's conviction. At the time Preston was implicated, appellant ''loaned him'' $15, but did not know how it was to be spent, although ''it was probably used to buy mercury with.''

The prosecuting attorney asked appellant if he did not, in February, promise to let mercury alone ''if given a break.'' Appellant replied: ''I told you I would tell you the truth, but I was not implicated in it.''

Appellant made a net profit of $226.30 on the July mercury deal. He denied knowing that Herron was under a five-year suspended sentence.

Questions and answers printed in the footnote are significant.[2] Other testimony tended to show that appel-

---

[2] "Q. Why did you tell Mr. Alford and me, when you were arrested, that you didn't know George Herron? A. Well, I didn't really know who you were talking about. Q. Why did you tell us you didn't know the Negro? A. I still say I don't know him. Q. Why did you tell us you didn't buy any mercury from George Herron and the Negro? A. I didn't buy any from the Negro. He was there, [but] George Herron brought the mercury. Q. Why did you tell us you hadn't bought any mercury at all in the last few days? A. Well, that was—. Q. That was what? A. I don't remember telling you that." [When the same questions were pressed further, appellant replied, "I don't know"].

lant knew the mercury he was dealing in had been stolen. The fact that Herron sold it for less than half value was a circumstance from which the jury must have inferred that Herron had a very personal reason for not wanting to appear in public with the commodity. Nor is appellant's status improved by his conduct in having the two procurers leave his car and wait at the roadside two hours while the sale was being made in Murfreesboro. Appellant was not a stranger to the methods by which his pilfering associates obtained mercury. His own son had succumbed to the lure of what appeared to be "easy money," and had been sentenced for his crimes.

The record is replete with actualities which point unerringly to appellant's guilty knowledge—lights and shadows of conduct which, when examined and appraised through reason's spectroscope, reveal mental processes unrelated to innocence.

Affirmed.